UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

KIM MURRELL,

                          Plaintiff,

             - against -

UNITED STATES OF AMERICA,

                        Defendant.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ___6/5/2018___

15-CV-875 (VSB)

**OPINION & ORDER**

Appearances:

Aaron S. Halpern
The Jacob D. Fuchsberg Law Firm, LLP
New York, New York
*Counsel for Plaintiff*

Arastu K. Chaudhury
Tara M. La Morte
United States Attorney's Office for the
Southern District of New York
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

      Plaintiff Kim Murrell brought this medical malpractice action on February 5, 2015 under

the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. § 2671 *et seq.*, against Defendant United

States of America and former co-defendants Dr. Jonathan P. Okun, the William F. Ryan

Community Health Center, Inc. (the "Ryan Center"), and the Ryan/Adair Community Health

Center a/k/a Thelma C. Davidson Adair/Ryan Center (the "Thelma Adair Center").  (Doc. 1.)

The case arises out of medical treatment Ms. Murrell received by Dr. Okun, a family medicine

practitioner, at the Thelma Adair Center, one of the locations that is part of the Ryan Center, a

deemed federal facility under the Federally Supported Health Centers Assistance Act, 42 U.S.C.

§ 233. Ms. Murrell claims that (1) she sought medical treatment at the Ryan Center for certain complaints and symptoms, and (2) Dr. Okun was negligent in failing to timely diagnose and appropriately treat her epiglottic cancer, which (3) resulted in the worsening of her cancer, surgery, and subsequent pain and suffering.  (*See* Compl. ¶¶ 26–28.)[1]  On May 7, 2015, I entered the parties' stipulation and order of dismissal, dismissing with prejudice all claims asserted against Dr. Okun, the Ryan Center, and the Thelma Adair Center.  (Doc. 12.)

From December 13, 2016 through December 15, 2016, I held a bench trial.  (*See* Docs. 48–53.)  The following witnesses were called by Plaintiff:  Dr. Okun, the only one of Plaintiff's treating physicians who was employed at the Ryan Center or any other deemed federal facility; Plaintiff; and Dr. John Robert Bogdasarian, Plaintiff's expert otolaryngologist.  Defendant called the following witnesses:  Dr. Ronald Blum, Defendant's expert oncologist; and Dr. James Mumford, Defendant's expert family physician.

This Opinion & Order contains my findings of fact and conclusions of law in this matter, pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I.      Findings of Fact

### A.      *Weighing the Evidence – Testimony and Medical Records*

1.      As a general matter, Plaintiff's testimony during the trial contradicted the contemporaneously created medical records and the testimony of Dr. Okun.  Plaintiff testified that every time she visited the Ryan Center, she "complain[ed] about [her] throat hurting," that "[she] kn[e]w [her] throat was killing [her] every time [she] went to the doctor and [she] told the doctor," and that she complained about her throat at other times without physicians writing it

---

[1] "Compl." refers to the Complaint, filed on February 5, 2015.  (Doc. 1.)

down.  (Tr. 258:24-259:3, 259:10-14, 309:11-310:1.)[2]

2.      Specifically, during her first visit on February 11, 2010, Plaintiff claims she told the treating physician that her throat was "killing her" and she was "choking all the time," (*id.* at 248:2-7, 250:21-251:14), but the medical record does not reflect that Plaintiff made any complaints about choking, (DX 1); rather, she indicated that she had a bad cough.[3]

3.      On her second visit on April 26, 2010, Plaintiff claims she told the treating physician that her "throat was hurting . . . real bad," she could "hardly talk," and she could "hardly move [her] head," but did *not* tell the physician she was better.  (Tr. 252:21-253:4, 253:15-19, 254:7-10.)  However, the medical record corresponding to the second visit documents Plaintiff telling the physician that her throat felt better, and there was no observation by the doctor that Plaintiff was having difficulty speaking.  (DX 2.)

4.      Plaintiff made a third visit to the Ryan Center on July 15, 2010.  (DX 3.)  Plaintiff testified that she visited the Ryan Center because of a rash and because of her throat. (Tr. 293:11-16, 294:18-24, 296:2-7.)  The medical record for this visit reports a rash as the reason for appointment, but the record reports no complaints of throat pain by Plaintiff and states that she was "feeling well otherwise."  (DX 3.)

5.      During her fourth visit at the Ryan Center—her first with Dr. Okun—on August 16, 2010, Plaintiff testified that she told Dr. Okun that her "throat was hurting real bad" and was hurting "all the time."  (Tr. 257:16-22, 260:15-18.)  The contemporaneously-created medical record, however, does not reflect any complaints of throat pain or difficulty swallowing.  (DX 4.)

6.      With regard to certain subsequent visits, Plaintiff testified that her visits with Dr.

---

[2] "Tr." refers to the transcript of the bench trial.  (Docs. 48, 50, 52.)

[3] The "DX" designation refers to Defendant's trial exhibits.

Okun on November 1 and November 3, 2010 were prompted by her throat pain. (Tr. 265:18-23, 302:17-303:2, 307:14-17.) However, the November 1 medical record affirmatively states that Plaintiff informed Dr. Okun that she did not have a sore throat, (DX 5), and the November 3 medical record reflects Plaintiff reporting that she was feeling better, (DX 6).

7.      Plaintiff also testified that during her April 18, 2011 visit with Dr. Okun, Dr. Okun did not ask her any questions about throat pain. (Tr. 268:6-269:4.) However, the medical record clearly indicates that Dr. Okun engaged in a conversation with Plaintiff about throat pain on that date, which caused Dr. Okun to note that Plaintiff "has had throat pain every night for four months, but the throat is normal during the day." (DX 8.)

8.      Finally, Plaintiff claims that Dr. Okun never referred her to a throat specialist and that she thought of going to a specialist on her own, (Tr. 270:19-23), but the medical record for Plaintiff's visit to Dr. Okun on June 15, 2011 indicates that Dr. Okun gave Plaintiff a referral to a otolaryngologist specifically for her throat pain, (DX 10, DX 15).

9.      I give greater weight to the medical records and to Dr. Okun's testimony for the following reasons:

> a.   First, Plaintiff testified that she suffered from a brain aneurysm in 2006, which affected her memory, and that she has trouble remembering conversations.[4] (*See* Tr. 246:7-9, 246:24-247:6, 320:3-9.)
>
> b.   Second, Plaintiff's testimony was at times internally inconsistent and/or contradictory. For example, Plaintiff mixed up dates and events connected to those dates, (*id.* at 248:11-18, 255:1-8, 256:25-257:12), insisted she saw

---

[4] Plaintiff suffered a brain aneurysm in 2006. (*See* DX 19.) Although some of Plaintiff's visits to Ryan Center were to obtain treatment in connection with her aneurysm, this medical condition and the resulting effects are not related to Plaintiff's claims in this case.

Dr. Okun during her second visit, even though he was not employed by the Ryan Center on that date, and changed her testimony once being informed of that fact, (*id.* at 252:21-253:13, 285:9-286:2), and altered her testimony with respect to when her throat began hurting less during the day and more at night, as opposed to hurting all of the time, (*id.* at 253:20-254:16, 260:5-18, 262:5-9, 267:3-24).

c. Third, Plaintiff's justification for the contradictions between her own testimony and the medical records is that the doctors did not write her complaints down. (*Id.* at 307:14-20.) However, as Dr. Mumford noted, if the circumstances were as Plaintiff depicted them, this would mean that, as of August 16, 2010, four physicians would have failed to document Plaintiff's complaints, (*id.* at 624:8-11), and that, as of November 8, 2010, five physicians would have failed to do so, (*see* DX 7). There is no dispute that each of these physicians took notes in connection with their examinations of Plaintiff, so for Plaintiff's account to be accurate, each of the physicians had to have failed to write down Plaintiff's complaints—which she now claims support the claims in this lawsuit—while writing down other notes about their examinations.

10. There was conflicting testimony concerning the interpretation of seemingly contradictory medical records reflecting the length of time Plaintiff experienced throat pain. Specifically, the June 15, 2011 medical record noting Dr. Okun's referral to an otolaryngologist states that the reason for the referral was "throat pain for 23 months in smoker," (DX 10), which would mean that Plaintiff's throat pain began on or about July 15, 2009. However, other medical

records reflect a different time period. For example, the April 18, 2011 record states that Plaintiff "has had throat pain every night for four months," (DX 8), and the August 22, 2011 record states that Plaintiff had "8 months of throat pain" that occurred "mostly at night, only when [she] swallows," (DX 12). Both of these records reflect an onset of throat pain beginning in or about December 2010.

11.     In explaining the June 15, 2011 record, Dr. Okun testified that one of two things may have happened. First, he testified that he could have determined it was twenty-three months after review with Plaintiff at that visit; however, this seemed unlikely to him, given the specificity of "23 months" and the greater likelihood that he would have written it differently, such as by noting "two years." (Tr. 183:4-183:17.) Second, Dr. Okun explained that the record contains a typographical error and should have read "2-3 months," which would make sense given Plaintiff's prior complaints. (*Id.* at 183:18-184:6.) Dr. Mumford arrived at the same conclusion as Dr. Okun, and presented his opinion that "23 months" must have been "a typographical error meant to reflect two to three months." (*Id.* at 749:2-5.) On the other hand, Dr. Bogdasarian read the record literally, and testified that he could "only read what the record says but she says it's been there for 23 months"; however, Dr. Bogdasarian also admitted that the records reflected conflicting periods of time at other occasions. (*Id.* at 458:3-15.)

12.     I give greater weight to the testimony interpreting the "23 months" language as a typographical error for at least the following reasons:

> a.  First, Dr. Bogdasarian admitted that, assuming the medical records accurately reflect the information Plaintiff provided to the doctors, there is nothing in those records from February 11, 2010—the date of Plaintiff's first visit to the Ryan Center—through June 15, 2011, to indicate that

Plaintiff was having persistent throat pain for twenty-three months. (*Id.* at 429:3-19.)

b. Second, if on June 15, 2011 Plaintiff had complained of throat pain for twenty-three months, that would mean Plaintiff had throat pain for approximately seven months prior to her first visit to the Ryan Center. There is no evidence in the record that indicates she sought treatment from another medical facility for this throat pain, which defies common sense.

c. Third, Dr. Mumford also explained that his opinion is based on the fact that this "would be consistent with the rest of the documentation in the chart," and there is nothing that would make him think "that the patient would not have said two years instead of 23 months if that were the case." (*Id.* at 749:2-17.) I find Dr. Mumford's explanation, which accords with Dr. Okun's explanation and with the medical records for other dates, persuasive.

d. Fourth, Plaintiff herself agreed that it was possible her throat pain began at the end of December 2010. (*Id.* at 313:3-314:1, 315:15-20.)

13.     I have also considered the relevant credentials and experience of the two experts offered to testify regarding the standard of care—Dr. Mumford and Dr. Bogdasarian—and find Dr. Mumford's testimony more persuasive. First, given that Dr. Okun is a family medicine physician—and thus the standard of care applicable to his practice is one for family medicine physicians—the testimony of Dr. Mumford, also a family medicine physician, (Tr. 570:13-16, 571:6-15), is more persuasive on this topic than that of Dr. Bogdasarian, who specializes in otolaryngology and is not a family medicine physician, (*see id.* at 336:10-21, 350:21-351:6).

Second, because I credit the medical records and Dr. Okun's testimony over Plaintiff's

testimony, I do not find that the testimony of these two experts conflict, with one exception—

whether Dr. Okun acted within the standard of care by not referring Plaintiff to an

otolaryngologist after the April 18, 2011 visit. With respect to that visit, Dr. Bogdasarian states

that he "think[s] that referral certainly at that point would have been standard." (*Id.* at 453:15-

25.) On the other hand, Dr. Mumford testified that the symptoms expressed at that visit were not

consistent with the type of throat pain a family medicine physician would typically expect with

cancer, and that there was nothing in the record to suggest that a referral to an otolaryngologist

would be needed. (*Id.* at 634:10-636:16, 638:16-639:10.) On this point, I credit Dr. Mumford's

testimony because Dr. Bogdasarian's statement was not expressed as an opinion but as a thought,

and therefore, it is not clear he was expressing his expert medical opinion; however, assuming he

was expressing his expert opinion, without crediting Plaintiff's testimony, Dr. Bogdasarian did

not provide any concrete reasoning or citation to evidence in the record for his conclusion.[5]

Additionally, it is noteworthy that Dr. Bogdasarian agreed with Dr. Mumford that it was

appropriate for Dr. Okun to prescribe a trial treatment with GERD[6] medication. (*Id.* at 453:15-

25.)

### B.    *Plaintiff's Treatment at the Ryan Center*

14.    The parties agree that Plaintiff received treatment at the Ryan Center from

---

[5] Although Defendant further claims that Dr. Bogdasarian contradicted his own testimony by concluding that a referral was warranted at the April 18, 2011 visit, (*see* Doc. 46 n.1), I do not agree. The testimony to which Defendant refers merely expressed that, assuming the accuracy of the medical records, there was nothing in the records to reflect that Plaintiff was having persistent throat pain for twenty-three months before June 15, 2011—not that the standard of care did not require referral to an otolaryngologist before June 15, 2011. (*See* Tr. 429:11-19.) This demonstrates the fact that Dr. Bogdasarian's thought "that referral certainly at that point would have been standard," (*id.* at 453:15-25), relies on crediting Plaintiff's testimony and reading the notes related to her June 15, 2011 medical examination in isolation.

[6] "GERD" refers to gastroesophageal reflux disease. (*See* Tr. 98:10-16.)

February 11, 2010 until August 22, 2011.  (Doc. 42 ¶¶ 6.c–q.)  The parties further agree that Dr.

Okun was the only treating physician employed by the Ryan Center who treated Plaintiff during

the relevant time period, and that all other treating physicians were not employees of the Ryan

Center or any other deemed federal facility.  (*Id.* ¶¶ 6.b.)

        15.      Dr. Okun is board certified in family medicine, (Tr. 23:18-21), which is a field of

medicine specializing in general practice and caring for illnesses in all age groups, (*id.* at 24:1-6).

As a family physician, Dr. Okun is exposed to patients with varied presentations and conditions.

(*Id.* at 24:7-11.)  Dr. Okun was the medical director in the family practice unit at the Thelma

Adair Center.  (*Id.* at 25:21-26:18.)

        16.      Dr. Okun saw Plaintiff for the first time on August 16, 2010.  (Doc. 42 ¶ 6.f;

DX 4.)  In total, Dr. Okun saw Plaintiff on six separate occasions:  August 16, 2010; November

1, 2010; November 3, 2010; April 18, 2011; June 15, 2011; and August 9, 2011.  (Doc. 42 ¶¶ 6.f,

i–j, l, n–o; DX 4–6, 8, 10–11.)

        17.      Before being treated by Dr. Okun, Plaintiff was treated at the Ryan Center on

three occasions:  February 11, 2010; April 26, 2010; and July 15, 2010.  (Doc. 42 ¶¶ 6.c–e;

DX 1–3.)

                a.   On February 11, 2010, Plaintiff was seen by Dr. Jasmeet Chadha-Singh, a

                     resident who was supervised by Dr. Claudia Levine.  (DX 1; Tr. 201:15-

                     23.)  Plaintiff was seen on this day as a follow up to an emergency room

                     visit, and was given a tentative diagnosis of COPD, or chronic obstructive

                     pulmonary disease—in this instance, chronic bronchitis.  (DX 1;

                     Tr. 202:20-203:5.)  Plaintiff had a sore throat, as well as a cough that was

                     productive of yellow sputum, for which the most common cause is a viral

infection. (DX 1; Tr. 203:6-12.) Dr. Chadha-Singh also noted that Plaintiff was a "chronic smoker" and would have approximately five episodes of coughing lasting for weeks every year, which would also be consistent with a COPD diagnosis. (DX 1; Tr. 203:13-204:4.) Specifically, Plaintiff began smoking when she was fourteen, and smoked around a pack a day for a "long time, 20 years, something like that." (Tr. 249:10-21.)

b. On April 26, 2010, Plaintiff was seen by Dr. Young Im Lee, another resident who was supervised by Dr. Claudia Levine. (DX 2; Tr. 204:9-15.) Plaintiff was treated for an upper respiratory infection ("URI"). (DX 2.) Plaintiff had again been to the emergency room for a sore throat, and was being seen as a follow up to that visit. (*Id.*; Tr. 204:19-205:2.) Plaintiff reported that her symptoms were "better now," (DX 2; Tr. 205:3-7), and Dr. Levine noted that Plaintiff's URI symptoms were "now resolving," (DX 2). At that visit, Plaintiff also expressed a desire to have another MRI as a follow up to her prior brain aneurysm surgery. (DX 2; Tr. 204:19-205:2.)

c. On July 15, 2010, Plaintiff was seen by Dr. Annamaria Iakovou, who was also a resident supervised by Dr. Claudia Levine. (DX 3; Tr. 205:22-206:5.) Plaintiff was treated for a rash, and expressed a concern that the rash may be because of bedbugs. (DX 3.) Plaintiff denied having any fever, chills, nausea, vomiting, or cough, and stated that she was "feeling well otherwise." (*Id.*; Tr. 206:17-207:4.)

18.     On August 16, 2010, Dr. Okun saw Plaintiff for the first time.  (Doc. 42 ¶ 6.f; DX 4.)  Prior to this first visit, Dr. Okun's practice would have been to review the charts related to Plaintiff's prior visits.  (Tr. 141:21-142:2.)  At that time, Plaintiff's last affirmative complaint of throat pain would have been approximately four months prior, and her last affirmative complaint of a cough would have been approximately six months prior.  (Tr. 208:18-209:7.)  The reason for the August 16 appointment was that Plaintiff had recently had the MRI as a follow up to her neurological issues, and "something came up."  (DX 4; Tr. 209:12-17, 210:2.)  Dr. Okun did a review of certain systems,[7] (DX 4; Tr. 209:18-211:5), referred Plaintiff to neurosurgery, (DX 4; Tr. 213:11-15), and focused on the aneurysm because an aneurysm that ruptures can "kill quickly," (Tr. 211:6-15).  Plaintiff did not complain about throat pain or a cough.  (DX 4; Tr. 211:22-213:10.)  The parties' experts agree that at this point, the standard of care did not require a referral to an otolaryngologist.  Specifically, Dr. Mumford testified that the standard of care did not require Dr. Okun to question Plaintiff about her prior throat pain, as long as Plaintiff did not volunteer throat pain as a complaint.  (Tr. 588:1-12.)  Dr. Bogdasarian agreed that the April 26, 2010 record was "probably more consistent with some sort of viral infection," and "might indicate that [Plaintiff's throat pain was] getting better," (*id.* at 436:17-24), and that as of this visit, based upon the records Dr. Okun had before him as of April 26, "it would be not necessary to make a referral" to an otolaryngologist, (*id.* at 443:23-444:5).

19.     After the August 16, 2010 visit, Dr. Okun had a few telephone conversations with an individual from St. Luke's Roosevelt neurosurgery as well as an individual from the office of a Dr. Ortiz regarding a medical procedure Plaintiff needed to have.  (DX 14; Tr. 213:16-216:18.)

---

[7] Merriam-Webster's medical dictionary defines "system" as "a group of body organs or structures that together perform one or more vital functions."  *System*, Merriam-Webster Medical Dictionary, https://www.merriam-webster.com/dictionary/system#medicalDictionary.

Dr. Okun noted, on the same day as the call from Dr. Ortiz's office on October 27, 2010, that Plaintiff needed to come into the office for an appointment for cardiology "asap." (DX 14.)

20.     Dr. Okun next saw Plaintiff on November 1, 2010. (DX 5; Tr. 216:19-23.) The purpose of this visit was to obtain pre-operative clearance and/or a risk assessment that was undertaken because Plaintiff was about to have a procedure—an angiogram—that had been recommended by the anesthesiologist after she had mentioned previously having a rapid heartbeat. (DX 5; Tr. 216:24-217:22.) During this visit, Dr. Okun performed a clearance exam and ordered a cardiology referral, among other actions. (DX 5; 217:23-218:16.) Plaintiff reported during this visit that she did not have a sore throat, (DX 5; Tr. 219:4-9), but that she had a cough with some phlegm, so Dr. Okun prescribed a Z-Pak, (DX 5; Tr. 218:19-22). The experts for each party agreed that—crediting the medical records and discounting Plaintiff's testimony—there was no need for Dr. Okun to refer Plaintiff to an otolaryngologist at this time. (Tr. 448:4-12, 628:7-629:6.)

21.     The November 3, 2010 visit with Dr. Okun was meant to follow up on the cough or bronchitis. (Tr. 223:16-224:7.) As of November 3, Plaintiff had not undergone the cardiology consultation. (DX 6.) With respect to her bronchitis, Plaintiff reported that she was "better." (*Id.*; Tr. 223:23-25.) Plaintiff did not report having throat pain. (DX 6; Tr. 224:8-22.) Dr. Okun told Plaintiff to continue the Z-Pak. (DX. 6.)

22.     Plaintiff's next visit was with Dr. Angela Palazzo on November 8, 2010. (DX 7; Tr. 225:21-226:10.) Dr. Palazzo specifically focused on Plaintiff's cardiology problems, and Dr. Okun's reading of the record related to this visit indicates that Dr. Palazzo determined that "no cardiac contra indication to cerebral angiogram." (Tr. 226:11-227:2.) Dr. Palazzo did not record any throat pain. (DX 7; Tr. 227:3-5.)

23.     Plaintiff next visited the Ryan Center approximately five months later on April

18, 2011, and saw Dr. Okun. (DX 8; Tr. 227:6-10.) Plaintiff complained of a rash, (DX 8;

Tr. 227:11-13), and Dr. Okun also determined upon questioning Plaintiff that Plaintiff had throat

pain every night for four months, but that the throat was normal during the day, (DX 8;

Tr. 227:14-19). Upon physical examination, Dr. Okun found that Plaintiff did not have any

swelling on the lymph nodes. (DX 8; Tr. 227:20-228:3.) Dr. Okun made a tentative diagnosis of

acid indigestion linked to GERD, or acid reflux, given that Plaintiff's throat pain presented only

at night; asked Plaintiff to schedule a follow up visit in three weeks; and prescribed Omeprazole,

a medication generally used for acid reflux and acid indigestion problems. (DX 8; Tr. 228:11-

229:7.) Dr. Okun also ordered a set of lab tests, which were taken one week later. (DX 8, 9;

Tr. 230:1-231:1.) In evaluating Dr. Okun's actions, Dr. Mumford explained that the worsening

of throat pain over the night was consistent with acid reflux—because when one lies down, the

acid comes up out of one's stomach—but was not consistent with the type of throat pain one

would typically expect with cancer. (Tr. 634:10-22, 636:2-16.) Dr. Mumford further testified

that the absence of hard lymph nodes was significant since that would be suggestive of cancer.

(*Id.* at 634:23-636:1.) For these reasons, Dr. Mumford opined that it was proper for Dr. Okun to

do a trial therapy to treat acid reflux disease, and that there was nothing to suggest that Plaintiff

required a referral to an otolaryngologist. (*Id.* at 638:16-639:10.) Dr. Bogdasarian confirmed

that if one credits the records, it was appropriate for Dr. Okun to prescribe a trial treatment with

GERD medication. (*Id.* at 453:15-25.)

24.     Plaintiff saw Dr. Okun again on June 15, 2011. (DX 10; Tr. 232:3-9.) Dr. Okun

discovered that Plaintiff reported that she had been unable to continue the Omeprazole because

of "timing,"[8] but that Plaintiff was still having throat pain while on the Omeprazole. (DX 10; Tr. 232:10-20.) Dr. Okun ordered that Plaintiff stop the Omeprazole and start Zantac in case Plaintiff was still experiencing a stomach acid issue. (DX 10; Tr. 232:21-233:4.) Dr. Okun denied Plaintiff's request that he prescribe Percocet for the throat pain, and, based on Plaintiff's history of throat pain, referred Plaintiff to an otolaryngologist. (DX 10, 15; Tr. 233:5-16.)

25.     Plaintiff did not use Dr. Okun's referral, but rather, on July 28, 2011, went to the Emergency Room and was referred to the ENT Clinic at St. Luke's Roosevelt Hospital Center. (DX 11, 17; Tr. 235:17-236:15.) Plaintiff was told that she needed a biopsy and would be getting a CAT scan. (DX 11.)

26.     Plaintiff returned to the Ryan Center on August 9, 2011, told Dr. Okun about her visit to the ENT Clinic, and reported that they suspected epiglottic cancer. (DX 11.) Plaintiff's August 9 visit was her last visit with Dr. Okun. During this visit, Dr. Okun prescribed Percocet to Plaintiff. (*Id.*)

27.     Plaintiff's final visit at the Ryan Center was on August 22, 2011, during which she saw Dr. Christine Nguyen, a resident supervised by Dr. Sophia Ofosu-Amaah. (DX 12.) Plaintiff required medical clearance for her biopsy of the epiglottic region, which had been tentatively scheduled for August 26, 2011, and reported an eight-month history of throat pain occurring mostly at night and only when swallowing. (*Id.*)

### C.     *Plaintiff's Cancer Diagnosis and Subsequent Treatment*

28.     Plaintiff had a biopsy on August 26, 2011, which confirmed the diagnosis of supraglottic cancer. (DX 16; Doc. 42 ¶ 6.r.)

29.     Plaintiff had a supraglottic laryngectomy on September 16, 2011 to remove the

---

[8] Dr. Okun indicated he did not know what this note meant. (Tr. 232:18.)

cancer. (Doc. 42 ¶ 6.s.) The pathology report produced following Plaintiff's surgery indicated

that Plaintiff's cancer was at Stage 4, or specifically, T2, N2b, Mx, with "T" indicating the tumor

component, "N" indicating the lymph nodes, and "M" referring to metastases. (DX 16; Tr.

347:5-15, 369:24-11, 503:6-13.) The "T2" number reflected that Plaintiff had a tumor at two

levels, the "N2b" number indicated that cancer was found in more than one lymph node, and the

"Mx" number demonstrated that there was no metastases or spread of cancer elsewhere.

(Tr. 369:12-22, 505:19-23.)

30.     Plaintiff received radiation therapy and chemotherapy related to her supraglottic

cancer, which she completed in March 2012. (Doc. 42 ¶ 6.t; Tr. 273:6-274:9.) At the time of

trial, Plaintiff's cancer was in remission. (Tr. 275:5-9; *see also* Doc. 42 ¶ 6.u.)

II.     **Conclusions of Law**

1.      Under the FTCA, the United States is liable for "personal injury or death caused

by the negligent or wrongful act or omission of any employee of the Government while acting

within the scope of his office or employment, under circumstances where the United States, if a

private person, would be liable to the claimant in accordance with the law of the place where the

act or omission occurred." 28 U.S.C. § 1346(b)(1).

2.      "Under the FTCA, courts are bound to apply the law of the state . . . where the

accident occurred." *Makarova v. United States*, 201 F.3d 110, 114 (2d Cir. 2000). Accordingly,

New York law governs because Plaintiff's treatment and injury occurred in New York.

3.      "[T]he law governing medical malpractice under the FTCA is well established."

*Kawache v. United States*, 471 F. App'x 10, 12 (2d Cir. 2012). To establish a medical

malpractice claim under New York law, a plaintiff must prove by a preponderance of evidence

"(1) that the defendant breached the standard of care in the community, and (2) that the breach

15

proximately caused the plaintiff's injuries." *Hersko v. United States*, No. 13-CV-3255 (JLC),

2017 WL 1957272, at *4 (S.D.N.Y. May 11, 2017) (quoting *Arkin v. Gittleson*, 32 F.3d 658, 664

(2d Cir. 1994)). "It is [also] well established in New York law that unless the alleged act of

malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the

plaintiff to present expert testimony in support of the allegations to establish a prima facie case

of malpractice." *Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987) (internal quotation

marks omitted); *see also Kawache v. United States*, No. 08-CV-3128 (KAM)(SMG), 2011 WL

441684, at *14 (E.D.N.Y. Feb. 7, 2011) ("[E]ach element must be established by expert medical

opinion unless the deviation from a proper standard of care is so obvious as to be within the

understanding of an ordinary layperson."), *aff'd*, 471 F. App'x 10 (2d Cir. 2012).

4.        The first element requires that a physician "exercise 'that reasonable degree of

learning and skill that is ordinarily possessed by physicians . . . in the locality where he practices.

The law holds the physician liable for an injury to his patient resulting from want of the requisite

knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best

judgment.'" *United States v. Perez*, 85 F. Supp. 2d 220, 226 (S.D.N.Y. 1999) (quoting *Pike v.

Honsinger*, 155 N.Y. 201, 209 (1898)).

5.        As explained above—relying on the evidence I find credible—the parties' experts

both agree that, prior to Plaintiff's April 18, 2011 visit with Dr. Okun, there was no departure

from the applicable standard of care. Furthermore, I find Dr. Mumford's testimony to be

credible in all respects, and rely on that testimony in reaching the conclusion that Dr. Okun did

not depart from the applicable standard of care at any point during his treatment of Plaintiff. In

any event, with respect to the only visit currently in dispute—the April 18, 2011 visit—Dr.

Mumford persuasively explained why, in conducting a proper differential diagnosis, a family

medicine practitioner in this locality would diagnose Plaintiff with GERD and prescribe a trial treatment consistent with that diagnosis. (*See* Tr. 634:10-636:16, 638:16-639:10.) Indeed, Dr. Bogdasarian agreed with Dr. Okun's approach, and only stated that he "thinks" a referral would have also been within the standard. (*Id.* at 453:15-25.) As such, and weighing the evidence as previously noted, I do not find that Plaintiff has proven by a preponderance of the evidence that Dr. Okun departed from the standard of care.

6.      Because I find that Plaintiff has failed to establish the element of breach, I need not reach the separate questions of causation and damages. *Cf. Kawache*, 2011 WL 441684, at *16 ("Because liability has not been established, there is no need to address the issue of damages.").

## III.      Conclusion

For the foregoing reasons, judgment shall be entered in favor of the United States. The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: June 5, 2018
        New York, New York

Vernon S. Broderick
United States District Judge